UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

MICHAEL T. ANDERSON,                                                  PETITIONER

V.                                        CIVIL ACTION NO. 3:18-CV-26-CWR-RPM

COMMISSIONER PELICIA
T. HALL, ET AL.                                                     RESPONDENTS

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

On January 11, 2018, petitioner Michael T. Anderson ("Anderson" or "petitioner") filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254 ("Section 2254"), seeking for his state court conviction to be set aside, his sentence vacated, and a new trial. Doc. [3]. The petitioner contends that he is unlawfully confined because his conviction and sentence were imposed in violation of the U.S. Constitution and "laws of the United States." *Id.*, at 1. On March 30, 2012, the petitioner was found guilty of: (i) first-degree murder, Miss. Code Ann. § 97–3–19(1)(a); (ii) aggravated assault, Miss. Code Ann. § 97–3–7(2)(b); and (iii) unlawful possession of a firearm by a felon, Miss. Code Ann. § 97–37–5. Doc. [9], Ex. 1. Pursuant to Miss. Code. Ann. § 99–19–83, the petitioner was sentenced to life imprisonment without the possibility of parole. *Id.*, Ex. 1.

### II.    FACTS

The following facts are adduced from the petition and documents attached thereto as well as from the state court and appellate record.

On April 10, 2009, Wysia Sanders ("Wysia") picked up her son, decedent Drystle Sanders ("Drystle"), from his job at Labor Finders. Doc. [9], Ex. 4 (W. Sanders T. 418:22–419:17). Upon returning home, Wysia and Drystle ate dinner before Drystle visited a friend for two or three hours. *Id.*, Ex. 4 (W. Sanders T. 420:2–26). After he returned home, Drystle and his mother talked for a while before his mother took a nap on the couch. *Id.*, Ex. 4 (W. Sanders T. 420:24–421:4). Shortly thereafter, Ernestine Coleman ("Coleman"), her son Sylvester Coleman ("Sylvester"), and stepson Travis Brown ("Travis") visited Wysia's house to "hang out" with Wysia and Drystle. *Id.*, Ex. 4 (S. Coleman T. 349:22–26, 351:5–27). The group sat around "talking and watching TV" as well as drinking a "couple of beers" and a "few drinks." *Id.*, Ex. 4 (S. Coleman T. 352:24–353:1); (T. Brown T. 407:7–9). Everyone was having "fun," *id.*, Ex. 4 (T. Brown T. 398:10–19), and "laughing [and] grinning" at that time, *id.*, Ex. 4 (W. Sanders T. 421:20–23).

Later that night, the group decided to get more beer and cigarettes. Doc. [9], Ex. 4 (E. Coleman T. 308:22–28); (T. Brown T. 407:10–13); (W. Sanders T. 422:2–14). Thereafter, Ernestine drove the group, that is herself, Sylvester, Travis, Wysia, and Drystle, *id.*, Ex. 4 (E. Coleman T. 309:6–10; S. Coleman T. 353:14–354:5, 366:10–14), in a white 1999 Buick Sentra ("Buick"), *id.*, Ex. 4 (S. Coleman T. 368:5–11). Wysia sat in the front passenger seat alongside Ernestine, *id.*, Ex. 4 (W. Sanders T. 427:5–9), while Drystle, Sylvester, and Travis sat in the back, *id.*, Ex. 4 (T. Brown T. 404:10–12, 408:1–11). Multiple witnesses testified that Drystle did not have a gun on him. *Id.*, Ex. 4 (E. Coleman T. 307:15–20); (T. Brown T. 416:26–27). Eventually, the group stopped at the Triple-A Store on Ridgeway Road. *Id.*, Ex. 4 (S. Coleman T. 365:19–366:5). During this time, the group was "happy," there "wasn't arguing," *id.*, Ex. 4 (W. Sanders T. 423:7–12), and everyone was in a "good mood," "laughing" and "joking,"  *id.*, Ex. 4 (E. Coleman T. 321:17–27).

2

That same day, Anderson had been spending time at his mother's "smoke damaged" house to "salvage a lot of [his and his mother's] personal items . . . photos, books[,] and mementos[.]" Doc. [9], Ex. 5 (M. Anderson T. 476:16–23). The house had no working utilities. *Id.*, Ex. 5 (M. Anderson T. 508:23–26). Between 9:00 PM and 9:30 PM, Anderson rode his bicycle to the Triple-A Store, which was a few blocks away, "to get some nonperishable items." *Id.*, Ex. 5 (M. Anderson T. 477:20–478:6). He testified that he arrived at the Triple-A Store unarmed because he is "not allowed to tote guns." *Id.*, Ex. 5 (M. Anderson T. 491:1–9). After parking his bicycle near a fence, Anderson entered the store and purchased "a bag of potato chips, two cakes, a drink, and some hard candy." *Id.*, Ex. 5 (M. Anderson T. 477:23–478:11). Then, he exited the store and was "on the lot talking" for about "20 or 25 minutes" before seeing the Buick pull into the Triple-A Store parking lot. *Id.*, Ex. 5 (M. Anderson T. 477:28–29, 478:15–20). At that point, Anderson "spoke with a hand gesture" to the women in the Buick—but they did not respond. *Id.*, Ex. 5 (M. Anderson T. 478:15–20). Then, "the guy" that Anderson was speaking with said he would be "right back" and left the area. *Id.*, Ex. 5 (M. Anderson T. 478:23–25). Anderson reentered the Triple-A Store to speak with the store clerk, who he knew. *Id.*, Ex. 5 (M. Anderson T. 478:23–25).

After Ernestine parked, Drystle and Sylvester exited the Buick and entered the Triple-A Store. Doc. [9], Ex. 4 (S. Coleman T. 368:16–18); (T. Brown T. 407:26–29).[1] Anderson had already reentered the store by the time that Drystle and Sylvester entered. *Id.*, Ex. 4 (S. Coleman T. 369:22–370:8).[2] Sylvester did not know who Anderson was at that time. *Id.*, Ex.4 (S. Coleman T. 361:21–23). Likewise, Drystle was a stranger to Anderson. *Id.*, Ex. 5 (M. Anderson T. 480:9–10, 481:20–26, 509:18–21).

---

[1] According to a State expert, the Triple-A Store parking lot had "plenty of light" emanating from lightbulbs attached to the Triple-A Store itself. *Id.*, Ex. 5 (C. Taylor T. 181:11–29).
[2] Sylvester positively identified Anderson in a non-suggestive photo lineup on April 11, 2010. *Id.*, Ex. 3 (K. Brown T. 233:17–234:2). He also identified Anderson in the courtroom. *Id.*, Ex. 4 (S. Coleman T. 358:11–21).

There is conflicting testimony at this juncture. According to Anderson, Drystle overheard him telling the Triple-A Store cashier that he tried to speak to two women outside, but they disregarded him because he "looked like [he] was from another planet." Doc. [9], Ex. 5 (M. Anderson T. 478:23–29). In particular, he was covered in "soot," had a "nasty beard," "wasn't changing everyday," and was wearing one of his mother's "floppy hats[.]" *Id.*, Ex. 5 (M. Anderson T. 479:23–480:8). Drystle interrupted the conversation and indicated that the women that Anderson gestured to were his and Sylvester's respective mothers. *Id.*, Ex. 5 (M. Anderson T. 482:9–14). In response, Anderson testified, he just threw up his hands without saying anything. *Id.*, Ex. 5 (M. Anderson T. 482:16–21). At that point, Drystle apparently "stormed out" of the store, but Anderson did not think much of it because Drystle was "just a drunk" with "poor posture." *Id.*, Ex. 5 (M. Anderson T. 482:22–27. 494:29–495:2). According to Anderson, he left the store at most five minutes after Drystle and Sylvester. *Id.*, Ex. 5 (M. Anderson T. 482:22–27).

Upon leaving, Anderson testified, he headed toward his bicycle, which was tipped over. Doc. [9], Ex. 5 (M. Anderson T. 483:24–29, 484:19–28). According to Anderson, he was hit in the back the head almost immediately upon exiting by Drystle. *Ibid.* At this point, Anderson began "fear[ing] for [his] life." *Id.*, Ex. 5 (M. Anderson T. 491:13–14). He was not afraid prior to this time in the store when initially seeing Drystle. *Id.*, Ex. 5 (M. Anderson T. 506:17–21). Anderson testified that the second hit "caught his finger" because he was turning around to defend himself with his hands. *Id.*, Ex. 5 (M. Anderson T. 507:1–7, 512:19–25). When the third hit came, Anderson "blocked it" and "the pistol fall [sic] straight out." *Id.*, Ex. 5 (M. Anderson T. 512:24–513:1). Anderson testified further that he either "dived" or "reached" to "get the pistol." *Id.*, Ex. 5 (M. Anderson T. 512:19–513:1). Upon grabbing the gun, Anderson "pull[ed] the trigger[,] not even aiming it" and "kept pulling the trigger until [he] stood straight up all [sic] the way." *Id.*, Ex.

4

5 (M. Anderson T. 488:1–9). Anderson did not dispute shooting and killing Drystle that night. *Id.*, Ex. 5 (M. Anderson T. 498:15–29). Immediately thereafter, Anderson testified, he dropped the gun and "walked" or "staggered" away to his mother's house and cried on the porch. *Id.*, Ex. 5 (M. Anderson T. 488:6–9, 490:6–7, 497:3–6).

According to several State witnesses, a different series of events unfolded that night. Sylvester testified there was no argument or disagreement between Anderson and Drystle in the Triple-A Store. Doc. [9], Ex. 4 (S. Coleman T. 372:14–23). Instead, upon entering the store, Drystle and Sylvester simply went to the back of the store to pick up more beer. *Id.*, Ex. 4 (S. Coleman T. 354:22–355:2, 370:9–14). Once Drystle and Sylvester went to pay for the beer, Sylvester testified, Anderson was no longer in the store. *Id.*, Ex. 4 (S. Coleman T. 370:3–371:2). While Sylvester remained in the store to finish bagging their purchases, Drystle exited the store to bring his mother a drink and cake. *See*, *e.g.*, *id.*, Ex. 4 (S. Coleman T. 355:20–24, 371:2–3). Finally, upon leaving, Sylvester noticed Drystle "tussling" or "wrestling" with Anderson but did not see a gun at first or hear arguing. *Id.*, Ex. 4 (S. Coleman T. 356:19–357:7, 376:1–7).

Multiple witnesses testified that they heard gunshots around the time that Sylvester exited the store. Doc. [9], Ex. 4 (S. Coleman T. 357:14–19, 386:7–18); (T. Brown T. 402:3–26); (W. Sanders T. 423:27–424:3). Upon hearing gunshots, Travis saw Drystle drop to the ground and a gun in Anderson's hand. *Id.*, Ex. 4 (T. Brown T. 402:9–11, 404:26–29).[3] Immediately after firing the shots, Sylvester, Ernestine, and Travis testified, Anderson began shooting at Sylvester. *Id.*, Ex. 4 (E. Coleman T. 302:6–21, 304:1–7); (S. Coleman T. 358:4–359:8); (T. Brown T. 402:3–13). Upon being shot at, Sylvester immediately fled from Anderson, with his back to the Triple-A Store. *Id.*, Ex. 4 (E. Coleman T. 302:6–21, 304:1–7); (S. Coleman T. 357:17–25, 359:2–3); (T. Brown T.

---

[3] Travis identified Anderson in the courtroom at trial as the person that he saw fighting with Drystle. *Id.*, Ex. 4 (T. Brown T. 401:12–21).

402:10–13); (W. Sanders T. 423:27–424:3). He told the remainder of the group, which was trying to get him into the Buick, to leave and meet him on the next street. *Id.*, Ex. 4 (S. Coleman T. 357:21–25).

According to two witnesses, Anderson then stood over Drystle with a gun, Doc. [9], Ex. 3 (G. Ward T. 159:7–27),[4] Ex. 4 (S. Johnson T. 335:17–22), and one witness, Stephen Johnson ("Johnson"),[5] testified to seeing Anderson shoot Drystle, who was slumped over, in the chest from close range, *id.*, Ex. 4 (S. Johnson T. 335:17–22, 337:11–19).[6] The bullet penetrated Drystle's sternum, perforated his heart and aorta, and caused his death. *Id.*, Ex. 5 (A. McMaster T. 460:7–18). In total, Drystle was shot three times by Anderson—in the left buttocks, upper left thigh, and chest. *Id.*, Ex. 5 (A. McMaster T. 461:21–462:2).

Roughly a block away on Livingston Road, Sylvester got into the Buick. Doc. [9], Ex. 4 (W. Sanders T. 424:8–15, 428:13–14). The group circled around to return to Drystle. *Id.*, Ex. 4 (T. Brown T. 402:3–403:10). When they were returning to Drystle, Anderson opened fire from Ridgeway, but he hit neither the Buick nor its occupants. *Id.*, Ex. 4 (E. Coleman T. 304:27–305:3); (S. Coleman T. 361:1–22); (T. Brown T. 402:3–403:10); (W. Sanders T. 424:22–27).[7] Thereafter, Anderson retreated from the scene, enabling the group to return to Drystle—who died before law

---

[4] Witness Garland Ward ("Ward") testified to being about ten feet away from scuffle and seeing Anderson's face. *Id.*, Ex. 3 (G. Ward T. 159:25–27, 161:5–8, 170:25–27, 178:1–5). Ward identified Anderson in a non-suggestive photo lineup on April 11, 2009 and later at trial. *Id.*, Ex. 3 (G. Ward T. 163:2—27, 164:27–165:4).

[5] Johnson testified that he was in the Triple-A Store lot, about 15–20 feet away from Drystle and Anderson, when he saw Anderson shoot Drystle from point-blank range in the chest. *Id.*, Ex. 4 (S. Johnson T. 326:29–327:1, 329:1–7, 331:23–26). He further testified that he had never seen Anderson, Drystle, Wysia, Travis, Sylvester, or Coleman before in his life. *Id.*, Ex. 4 (S. Johnson T. 332:1–10, 343:1–3). Johnson positively identified Anderson as the shooter in a non-suggestive photo lineup on April 11, 2010. *Id.*, Ex. 3 (K. Brown T. 235:6–11). He later identified Anderson in court. *Id.*, Ex. 4 (S. Johnson T. 347:9–24).

[6] Unprompted, Anderson denied shooting Drystle in the chest at trial. *Id.*, Ex. 5 (M. Anderson T. 498:18–24). When question about Johnson's truthfulness on cross-examination, Anderson suggested, without evidence, that Johnson committed perjury. *Id.*, Ex. 5 (M. Anderson T. 501:11–29).

[7] Two 9-millimeter cartridge casings were later found along Ridgeway, about 120 feet from Drystle's body. *Id.*, Ex. 3 (C. Taylor T. 207:21–25). These two cartridge casings were ejected from a single gun. *Id.*, Ex. 3 (B. McIntyre T. 258:1–7). However, these cartridge cases were ejected from a different gun than the five cartridge casings found by Drystle's body. *Id.*, Ex. 3 (B. McIntyre T. 257:1–6, 258:8–13).

enforcement arrived. *Id.*, Ex. 3 (C. Taylor T. 181:5–10); (D. Stasher T. 220:6–221:5); Ex. 4 (E. Coleman T. 306:26–307:14).

Anderson waited two days before turning himself in. Doc. [9], Ex. 5 (M. Anderson T. 492:8–9). Anderson testified that he waited because he "really wanted to find out what happened, who and what," *id.*, Ex. 5 (M. Anderson T. 492:11–12), and "thought it was someone just trying to kill [him], contracted[,]" *id.*, Ex. 5 (M. Anderson T. 492:12–13). On April 13, 2009, Anderson surrendered, *id.*, Ex. 5 (M. Anderson T. 492:2–13), to Sheriff's Deputy Donald Rhodes at the Deluxe Inn on Highway 80, *id.*, Ex. 3 (D. Rhodes T. 248:18–249:10).

### III.    PROCEDURAL HISTORY

On March 26, 2012, the petitioner was brought to trial. Following a week-long jury trial, Anderson was convicted on all Counts. Doc. [9], Ex. 5 (T. 598–599). On June 29, 2012, the petitioner directly appealed from his state-court conviction. *Id.*, Ex. 8. On appeal, he argued that the state trial court erred by (i) giving a flight instruction to the jury; (ii) instructing the jury that self-defense is not a defense to a felon-in-possession charge; and (iii) refusing to allow him to introduce evidence of Drystle's blood-alcohol content ("BAC"), which was 0.193, Doc. [1], Ex. C, during the night in question, Doc. [9], Ex. 8. The Mississippi Court of Appeals affirmed the petitioner's conviction. *See Anderson v. State*, 185 So.3d 1015 (Miss. Ct. App. 2014). After his motion for a rehearing was denied, the petitioner filed a petition for a writ of *certiorari* with the Mississippi Supreme Court on the flight instruction issue, Doc. [9], Ex. 9, at 48–51, which was granted on June 4, 2015, *see Anderson v. State*, 166 So.3d 38 (Miss. 2015). Over a dissent, the Mississippi Supreme Court held that the state trial court properly gave a flight instruction and upheld Anderson's conviction. *Anderson v. State*, 185 So.3d 966 (Miss. 2015). Anderson did not petition the United States Supreme Court for a writ of *certiorari*. On June 8, 2017, Anderson

petitioned the Mississippi Supreme Court, pursuant to Miss. Code. Ann. § 99–39–7, for leave to file a motion for post-conviction collateral relief ("PCR petition"). Doc. [9], Ex. 10, at 7. In his PCR petition, Anderson raised five issues that may be collapsed into three overarching arguments.

First, Anderson argued that he received constitutionally ineffective assistance from his trial counsel because counsel (i) failed to re-urge the trial court judge to allow Anderson to introduce testimony from three witnesses showing Drystle's prior violent conduct; (ii) failed to introduce Drystle's arrest record; and (iii) failed to recall witnesses to testify about Sanders' alcohol consumption on the night of the shooting. Doc. [9], Ex. 10, at 16–23. Second, Anderson argued that he received ineffective assistance of appellate counsel on direct appeal following his conviction because appellate counsel (i) did not raise an ineffective assistance of counsel claim on direct appeal and (ii) failed to raise the issue of Drystle's BAC in his petition for a writ of *certiorari* to the Mississippi Supreme Court. *Id.*, Ex. 10, at 23–25, 28–29. Finally, the petitioner argues that the trial court's failure to allow him to present Drystle's BAC violated his due process rights by denying him a fundamentally fair trial. *Id.*, Ex. 10, at 25–28. The petitioner also sought an evidentiary hearing. *Id.*, Ex. 10, at 9. These same arguments are presently before this Court. *See* Doc. [3].

On January 10, 2018, the Mississippi Supreme Court denied Anderson's PCR petition in a summary order that reached the merits of his underlying motion. Doc. [9], Ex. 10, at 2–3. The Court ruled that the petitioner's due process claim on the BAC issue was barred by operation of *res judicata*. *Id.*, Ex. 10, at 2. The Court also ruled that the petitioner's *Strickland* claims were meritless, concluding that he failed to show either deficient performance or prejudice under *Strickland*. *Id.*, Ex. 10, at 2–3. On January 11, 2018, the petitioner filed the present federal habeas petition. Doc. [1, 3].

## IV.    <u>STANDARD OF REVIEW</u>

To determine whether a petitioner is entitled to a writ of habeas corpus, a federal court is required to apply the standard of review set forth in Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which states, in relevant part,

> (d) An application for a writ of *habeas corpus* on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

[28 U.S.C. § 2254(d).]

"Section 2254(d)(1)'s 'clearly established' phrase 'refers to the *holdings*, as opposed to the dicta, of th[e] [Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Lockyer v. Andrade*, 538 U.S. 63, 71, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) (emphasis added) (quoting *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). *See also Poree v. Collins*, 866 F.3d 235, 246 (5th Cir. 2017). Put differently, "'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Id.* at 71–72 (citations omitted). "[T]he lack of a Supreme Court decision on nearly identical facts does not by itself mean that there is no clearly established federal law, since 'a general standard' from [the Supreme] Court's cases can supply such law." *Poree*, 866 F.3d at 246 (quoting *Marshall v. Rodgers*, 569 U.S. 58, 133 S.Ct. 1446, 1449, 185 L.Ed.2d 540 (2013) (per curiam)).

The "'contrary to' and 'unreasonable application' clauses have independent meaning." *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (citing *Williams*, 529 U.S. at 404–5). A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Lockyer*, 538 U.S. at 73 (quoting *Williams*, 529 U.S. at 412–13). A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] petitioner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "[R]eview under [Section] 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011).

Under Section 2254(d)(2), "relief may be granted if the state court's decision 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Matamoros v. Stephens*, 783 F.3d 212, 215–16 (5th Cir. 2015) (quoting 28 U.S.C. § 2254(d)(2)). Under Section 2254(d)(2), a state court's "factual findings are 'presumed to be correct' unless the habeas petitioner rebuts the presumption through 'clear and convincing evidence.'" *Saldano v. Davis*, 759 F. App'x 276, 278 (5th Cir.), *cert. denied*, 140 S.Ct. 520, 205 L.Ed.2d 339 (2019) (quoting *Nelson v. Quarterman*, 472 F.3d 287, 292 (5th Cir. 2006)). *See also Miller–El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). As such, "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301, 130 S.Ct. 841, 175 L.Ed.2d 738 (2010) (citing *Williams*, 529 U.S. at 411). "[E]ven if '[r]easonable

minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Wood*, 558 U.S. at 301 (quoting *Rice v. Collins*, 546 U.S. 333, 341–42, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006)).   As such, the state trial court is accorded "substantial deference[,]" but "deference does not imply abandonment or abdication of judicial review," and "does not by definition preclude relief." *Brumfield v. Cain*, 576 U.S. 305, 314, 135 S.Ct. 2269, 192 L.Ed.2d 356 (2015) (citations omitted).

## V.   <u>ANALYSIS</u>

### A.   <u>Evidentiary Hearing Issue</u>

The petitioner seeks an evidentiary hearing in order to "show that the testimony of the witnesses excluded by the trial court[, Johnny Lee Field ("Field"), Nolan Smith ("Smith"), and Fitzgerald Houston ("Houston"),] would have corroborated his testimony that Sanders was the initial aggressor." Doc. [11], at 4. *See also* Doc. [3], at 18. However, state prisoners seeking federal habeas relief are not generally entitled to an evidentiary hearing, *see* 28 U.S.C. § 2254(e)(2), regardless of whether Section 2254(d)(1) or (2) applies, *Cullen*, 563 U.S. at 185–86. In all cases, "[i]f the prisoner has failed to develop the facts, an evidentiary hearing cannot be granted unless the prisoner's case meets the other conditions of [Section] 2254(e)(2)." *Michael Williams v. Taylor*, 529 U.S. 420, 430, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000).

Under the opening clause of [Section] 2254(e)(2), "a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id.* at 432. "The question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts." *Id.* at 435. "Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it

does not depend[] . . . upon whether those efforts could have been successful." *Ibid.* Finally, if the petitioner was not diligent, the Court will not bar an evidentiary hearing if "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, . . . was previously unavailable[,]" 28 U.S.C. § 2254(e)(2)(A)(i), or "if efforts to discover the facts would have been in vain, see [Section] 2254(e)(2)(A)(ii), and[, in both cases,] there is a convincing claim of innocence, see [Section] 2254(e)(2)(B)[.]"  *Michael Williams*, 529 U.S. at 435.

Here, the petitioner did not take any investigative steps to "develop the factual basis of a claim[.]" *Id.* at 432. The petitioner did not seek an affidavit from trial or appellate counsel explaining the reasons behind their various decisions, notwithstanding the opportunity to do so. *Goodin v. State*, 856 So.2d 267, 281–83 (Miss. 2003) (considering attorney affidavit submitted with petition for leave to file a PCR motion), *overruled on other grounds by Lynch v. State*, 951 So.2d 549 (Miss. 2007). Indeed, the petitioner even attached Drystle's arrest record as an exhibit to his PCR petition. Doc. [9], Ex. 10, at 39–56. Furthermore, the petitioner did not seek, or submit, affidavits by uncalled witnesses Field, Smith, and Houston. Doc. [3], at 6. As the petitioner himself noted, the identities and proposed testimony of these witnesses was readily apparent, *inter alia*, from the state trial transcript. *See*, *e.g.*, *id.*, Ex. 2 (T. 15–16, 49). In fact, the petitioner's only effort before the present request for an evidentiary hearing was his request for an evidentiary hearing in his PCR petition. Without more, the petitioner's mere request for an evidentiary hearing in his PCR petition is plainly insufficient to constitute "a reasonable attempt, in light of the information available at the time, to *investigate* and pursue claims in state court[.]" *Michael Williams*, 529 U.S. at 432 (emphasis added).[8]

---

[8] *See also Holland v. Jackson*, 542 U.S. 649, 124 S.Ct. 2736, 159 L.Ed.2d 683 (2004) (per curiam); *Jones v. Davis*, 890 F.3d 559, 566 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 795, 202 L.Ed.2d 587 (2019).

Since the petitioner has not shown that he was diligent during the state proceedings, he must meet one of the exceptions noted above. 28 U.S.C. § 2254(e)(2). The petitioner has not made a showing to support a finding of any exception. The facts that the petitioner seeks to develop here, the testimony of Field, Smith, and Houston, were plainly ripe for development even prior to the petitioner undertaking PCR proceedings in state court. *See*, *e.g.*, Doc. [9], Ex. 2 (T. 15–16). Finally, the petitioner has not put forth any Supreme Court precedent applicable here that was previously unavailable. 28 U.S.C. § 2254(e)(2)(A)(i). [9] This argument fails.

## B. Ineffective Assistance of Counsel Claims Generally

### i. Introduction

"The Sixth Amendment's guarantee that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence' entails that defendants are entitled to be represented by an attorney who meets at least a minimal standard of competence." *Hinton v. Alabama*, 571 U.S. 263, 272, 134 S.Ct. 1081, 188 L.Ed.2d 1 (2014). *See also Evitts v. Lucey*, 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) (establishing constitutional right to effective assistance of appellate counsel). It is well-established that to prevail on a claim of constitutionally ineffective assistance of counsel, a petitioner must show that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[10] Nevertheless, the Court does not simply apply a *de novo Strickland* analysis. *See* Doc. [3, 11].

---

[9] In his reply, the petitioner argued for the first time that *Earp v. Ornoski*, 431 F.3d 1158 (9th Cir. 2005) stands for the proposition that a finding that a "state court's decision was an unreasonable determination of the facts in light of the evidence presented to the state court" mandates that a federal habeas court hold an evidentiary hearing if six factors are present. Doc. [11], at 4. Putting aside the time that petitioner raised this issue, *Earp* does not apply to situations, like here, where Section 2254(e)(2) bars an evidentiary hearing. *Michael Williams*, 529 U.S. at 429–31 ("If the prisoner has failed to develop the facts, an evidentiary hearing cannot be granted unless the prisoner's case meets the other conditions of § 2254(e)(2).").

[10] The *Strickland* framework applies with equal force to claims of ineffective assistance of trial and appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000).

## ii.     Application of Section 2254(d)

The parties do not contest that the Mississippi Supreme Court adjudicated Anderson's *Strickland* claims in his PCR petition on the merits in a summary disposition.[11] Doc. [8], Ex. C. "When, as here, there is no reasoned state-court decision on the merits, the federal court 'must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e] [Supreme] Court.'" *Sexton v. Beaudreaux*, —— U.S. ——, 138 S.Ct. 2555, 2558, 201 L.Ed.2d 986 (2018) (quoting *Harrington v. Richter*, 562 U.S. 86, 102, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011)). *See also Mejia v. Davis*, 906 F.3d 307, 314 (5th Cir. 2018), *cert. denied*, 139 S.Ct. 1229, 203 L.Ed.2d 244 (2019). "If such

---

[11] In passing, the Court notes that while the petitioner does not dispute that the Mississippi Supreme Court adjudicated his *Strickland* claims on the merits, the petitioner nonetheless appears to understand—without any explanation—that the Court must undertake a *de novo* review of his *Strickland* claims. Doc. [3].

"When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted." *Cullen*, 563 U.S. at 301. In particular, "[t]he presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Richter*, 562 U.S. at 99–100 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). In its summary disposition, the Mississippi Supreme Court stated that "Anderson's claims fail to meet the requisite prongs of deficient performance and prejudice provided in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)." Doc. [8], Ex. C. On its face, the Mississippi Supreme Court decision leaves "no reason to think some other explanation for the state court's decision is more likely." *Richter*, 562 U.S. at 99–100 (citing *Ylst*, 501 U.S. at 803). The petitioner does not provide any reason to suggest that "some other explanation for the state court's decision is more likely." *Ibid.* Thus, Section 2254(d) applies to the petitioner's *Strickland* claims. *Id.* (citing *Ylst*, 501 U.S.at 803).

Since Section 2254(d) applies, the next question is determining under which exception to Section 2254(d) is closest to the petitioner's *de novo Strickland* arguments. First, the petitioner's *Strickland* arguments do not suggest that "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "[t]he state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Lockyer*, 538 U.S. at 73 (quoting *Williams*, 529 U.S. at 412–13). Indeed, the petitioner neither disputes that *Strickland* applies to his ineffective assistance of counsel claims nor that "[t]he state court decide[d] a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id.* (citations omitted). Furthermore, the petitioner's *Strickland* arguments do not challenge the *factual findings* made during state court proceedings, eliminating Section 2254(d)(2). *See, e.g.*, *Matamoros*, 783 F.3d at 215–16. Instead, since the petitioner is only seeking *de novo* application of *Strickland*, the Court infers that the petitioner found the Mississippi Supreme Court's decision on his *Strickland* claims to be an "unreasonable application" of clearly established federal law. *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413).

disagreement is possible, then the petitioner's claim must be denied." *Beaudreaux*, 138 S.Ct. at 2558 (citing *Richter*, 562 U.S. at 102).[12]

### iii.    <u>Double Deference:</u> AEDPA and *Strickland* IAC

*Strickland* claims "adjudicated on the merits" in state court are subject to the Section 2254(d) relitigation bar, "subject only to the exceptions in [Sections] 2254(d)(1) and (2)." *Richter*, 562 U.S. at 98. For one, AEDPA establishes a deferential standard of review that is "intentionally 'difficult to meet.'" *Woods v. Donald*, 575 U.S. 312, 316, 135 S.Ct. 1372, 191 L.Ed.2d 464 (2015) (quoting *White v. Woodall*, 572 U.S. 415, 419, 134 S.Ct. 1697, 188 L.Ed.2d 698 (2014)). However, the *Strickland* standard itself, even on *de novo* review, is also a "high bar" that is "never an easy task" to overcome. *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). *See also Richter*, 562 U.S. at 105 ("[T]he standard for judging counsel's representation is a most deferential one."). After all, "[u]nlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge." *Richter*, 562 U.S. at 105. Since both the *Strickland* standard and Section 2254(d)(1) are "highly deferential . . .[,] when the two apply in tandem, review is 'doubly' so[.]" *Id.* (citations omitted).

On federal habeas appeal from state court, the question presented, then, is not whether defense counsel's actions were reasonable. *Ibid.* "[I]t is well settled that a state court's 'unreasonable application of [*Strickland*]'—which AEDPA demands—'is different from an incorrect application of [*Strickland*].'" *Mejia*, 906 F.3d at 315 (quoting *Richter*, 562 U.S. at 101). Instead, "[t]he

---

[12] As will be explained below, in this case, the deference owed under Section 2254(d) is limited to the petitioner's *Strickland* claims.

question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.[13]

### C. Ineffective Assistance of Trial Counsel

#### i.   Law

The petitioner's first argument is that his trial counsel provided ineffective assistance of counsel in violation of his Sixth Amendment rights. Doc. [3], at 5–11. As noted above, the *Strickland* analysis has two prongs: (i) deficient performance and (ii) prejudice. *Strickland*, 466 U.S. at 687. To establish deficient performance, "a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'" *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 688). "'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Hinton*, 571 U.S. at 273 (quoting *Padilla*, 559 U.S. at 366).

With respect to prejudice, "a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 694). It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

---

[13] Since both ineffective assistance of trial and appellate counsel derive from *Strickland*, *see, e.g.*, *Smith*, 528 U.S. at 285, it follows that "double deference" applies to *both* ineffective assistance of trial counsel and ineffective assistance of appellate counsel, *see, e.g.*, *Dorsey v. Stephens*, 720 F.3d 309, 319–22 (5th Cir. 2013); *Smith v. Thaler*, 526 F. App'x 395 (5th Cir. 2013).

### ii. Application

The petitioner argues that his trial counsel was constitutionally ineffective for three distinct reasons. The petitioner identifies trial counsel's (i) failure to re-urge the state trial court to allow three potential defense witnesses, Field, Smith, and Houston, to testify as to Drystle's propensity for violence, Doc. [3], at 6; (ii) failure to introduce violent crimes noted in Drystle's arrest record, *id.*, at 7;  and (iii) that trial counsel provided constitutionally ineffective assistance because she did not "recall the witnesses who were with Sanders that night and question them about Sanders' alcohol consumption[]" in furtherance of Anderson's self-defense claim, *id.*, at 11–12.[14]

Turning to the petitioner's first argument, he has failed to put forward an attorney affidavit or other evidence explaining why trial counsel did not re-urge the state trial court to allow Field, Smith, and Houston to testify. *Goodin*, 856 So.2d at 281–83. It is well-established that "[w]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003). Further, "[t]hat presumption has particular force where a petitioner bases his ineffective-assistance claim solely on the trial record, creating a situation in which a court 'may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive.'" *Id.* (quoting *Massaro v. United States*, 538 U.S. 500, 505, 123 S.Ct. 1690, 1694, 155 L.Ed.2d 714 (2003)).

---

[14] In passing, the Court clarifies a factually incorrect argument made by the petitioner. The petitioner presupposes that the trial court "postpone[d] a ruling on the issue" of Drystle's prior violent conduct until the petitioner testified for the defense. This is incorrect. Before trial, trial counsel argued, in relevant part, that "if there is some testimony that is revealed *through a state witness* that indicates that there was an overt act taken by the decedent, then from that point the defendant has an opportunity to that witness and other witnesses regarding the decedent's propensity for violence." Doc. [9], Ex. 2 (T. 18:24–19:5) (emphasis added). Since no State witness testified that he or she saw how the "tussle" began, trial counsel did not establish an overt act through the State witnesses and, thus, had no occasion to re-urge the state trial court on that basis. To the extent that the petitioner is arguing that trial counsel *forgot* about the pretrial postponement and that constitutes ineffective assistance of counsel, it fails. Nevertheless, the state trial court did not expressly limit the petitioner to re-urging in the context of the State's witnesses. *Id.*, Ex. 2 (T. 19:16–21).

On its face, the trial record alone would appear to suggest no plausible reason for trial counsel's failure to re-urge the state trial court allow testimony by Field, Smith, and Houston, except "sheer neglect." *Gentry*, 540 U.S. at 8. From the brief state record on this issue, Field and Smith were going to testify about Drystle's propensity for violence. [15] At the outset, since Anderson testified that he did not know Drystle, Doc. [9], Ex. 5 (M. Anderson T. 481:20–26, 509:18–21), the introduction of character evidence about Drystle's propensity for violence would not be relevant to Anderson's state of mind—a key use of such evidence, *see*, *e.g.*, *Green v. State*, 614 So.2d 926, 934 (Miss. 1992). However, if Anderson "offer[ed] evidence of an alleged victim's pertinent trait, and if the evidence [wa]s admitted," then the "prosecutor may [have] offer[ed] evidence to rebut it[] . . . [and] may [have] offer[ed] evidence of the alleged victim's trait of peacefulness to rebut evidence that the victim was the first aggressor." M.R.E. 404(a)(2)(B)–(C). The state record reflects that, once that door was opened, the State fully intended on walking through it. For example, prior to trial, the prosecutor noted that if these witnesses testified, he would introduce evidence that Drystle was never convicted of a felony. Doc. [9], Ex. 2 (T. 15–17). In addition to keeping the door closed, there are other potential strategic reasons that explain why trial counsel did not re-urge the state trial court to allow Field, Smith, and Houston to testify. For example, trial counsel simply could have subsequently made a strategic decision that the potential defense witnesses were not credible and would only hurt the defense's case. There are myriad possible strategic reasons why trial counsel did not re-urge the state trial court to allow the potential witnesses to testify. As noted above, the petitioner does not put forth any evidence that explains why trial counsel declined to re-urge the state trial court to allow Field, Smith, and Houston to

---

[15] Apparently, Field was going to testify that, at an unknown date in the past, Drystle once hit him in the back of the head with a brick and broke out his car windows. Doc. [9], Ex. 2 (T. 16). It is unknown what Smith was going to testify about specifically, only that he was going to testify about Drystle's propensity for violence *Ibid.* The only reference to Houston in the record was a brief mention during *voir dire*. *Id.*, Ex. 2 (T. 49).

testify. *Ibid.* As such, the Mississippi Supreme Court could have reasonably presumed that trial counsel's failure to re-urge on this issue was a strategic decision that the petitioner did not overcome, and, therefore, reasonably concluded that trial counsel's performance was not "deficient." Doc. [9], Ex. 10, at 2–3. The Court does not reach the prejudice prong. *Strickland*, 466 U.S. at 697.

Next, the Court turns to the argument that trial counsel's failure to introduce evidence of violent crimes in Drystle's arrest record constituted ineffective assistance by trial counsel. Doc. [3], Ex. 2.[16] On its face, the failure to introduce evidence of Drystle's propensity for violence would appear to be "sheer neglect." *Gentry*, 540 U.S. at 8. Nevertheless, there are strategic reasons why trial counsel could have decided against introducing the arrest record in the context of Anderson's trial. To begin with, Drystle had only misdemeanor convictions and no arrests within about five years of his death. Doc. [3], Ex. 2.[17] Furthermore, since Anderson testified that he did not know Drystle, Doc. [9], Ex. 5 (M. Anderson T. 481:20–26, 509:18–21), the introduction of Drystle's arrest record would not be relevant to Anderson's state of mind, *see*, *e.g.*, *Green*, 614 So.2d at 934. Still, these dated instances of misdemeanor violence would be somewhat relevant to proving that Drystle started the fight. *Nevertheless*, if Anderson "offer[ed] evidence of an alleged victim's pertinent trait, and if the evidence [wa]s admitted," then the "prosecutor may [have] offer[ed] evidence to rebut it[] . . . [and] may [have] offer[ed] evidence of the alleged victim's trait of peacefulness to rebut evidence that the victim was the first aggressor." M.R.E. 404(a)(2)(B)–(C). In this context, trial counsel could have strategically decided that introducing Drystle's stale misdemeanor convictions was not worth the risk of opening the door to evidence of Drystle's peacefulness.

---

[16] In passing, the Court notes that the copy of Drystle's arrest record provided does not specify the disposition of many charges brought against him. *See* Doc. [3], Ex. 2.

[17] Anderson needed to first establish an overt act, *see*, *e.g.*, *Miller v. State*, 956 So.2d 221, 226 (Miss. 2007), which he only did once he testified, *see*, *e.g.*, Doc. [9], Ex. 5 (M. Anderson T. 483:24–29, 484:19–28).

Indeed, trial counsel could have had knowledge, not in the record, that Drystle, who was employed, Doc. [9], Ex. 4 (W. Sanders T. 419:5–17), matured over the course of five years and was known in the community for his charity work as well as breaking up fights. Perhaps Drystle had become a pacifist years before the night in question. In short, there are several strategic explanations for trial counsel's failure to introduce Drystle's arrest record.[18] Once more, however, the petitioner fails to provide any evidence to explain why trial counsel's failure to introduce Drystle's arrest record was not strategic, instead relying on silence in the record. *Gentry*, 540 U.S. at 8.  On the present facts, the Mississippi Supreme Court could have reasonably presumed that trial counsel's failure to introduce Drystle's arrest record was a strategic decision that the petitioner did not overcome, and, therefore, reasonably concluded that trial counsel's performance was not "deficient." The Court does not reach the prejudice prong. *Strickland*, 466 U.S. at 697.

Finally, the Court addresses the petitioner's argument that trial counsel failed to call or "recall the witnesses who were with Sanders that night and question them about Sanders' alcohol consumption[]" in furtherance of Anderson's self-defense claim constituted ineffective assistance of counsel. Doc. [3], at 11–12. In support, the petitioner refers to a colloquy that occurred immediately before the conclusion of the State's case, *see* Doc. [9], Ex. 5 (T. 466–472), wherein the state trial court prohibited him from introducing Drystle's BAC but allowed him to question witnesses about Drystle's drinking during the night in question, *id.*, Ex. 5 (T. 470–72).[19]

---

[18] Trial counsel's decision not to introduce Drystle's arrest record would be consistent with trial counsel's decision not to introduce character witness testimony.

[19] The state trial court did not specify whether his ruling would have allowed trial counsel to recall the State's witnesses. *Id.*, Ex. 5 (T. 471–72). While the context of the colloquy suggests that the state trial court was only referring to witnesses for the defense, for present purposes, the Court assumes *arguendo* that trial counsel would have been able to recall the State's witnesses and question those who saw Drystle drinking alcohol.

Furthermore, the Court notes that trial counsel was at first barred from asking about Drystle's drinking that night. *Id.*, Ex. 4 (E. Coleman T. 308:26–309:5). Later, on direct examination, Sylvester admitted that they were drinking a "couple of beers" that night. *Id.*, Ex. 4 (S. Coleman T. 352:24–353:1). Finally, on cross-examination, trial counsel

To begin with, eyewitness testimony that Drystle was drinking alcohol was not particularly relevant. First, it was not established that Drystle was violent when drunk during the State's case or at trial more generally. Further, Anderson later testified that he did not know Drystle and did not fear him upon seeing him, a so-called "drunk with poor posture," inside the Triple-A Store. *Id.*, Ex. 5 (M. Anderson T. 482:22–27. 494:29–495:2). Considering the relative weakness of the evidence, there are a number of potential, strategic decisions behind trial counsel's decision not to recall Drystle's family and friends to testify about how much Drystle drank the night that he was killed. Indeed, recalling Drystle's friends and family could have simply produced answers that Drystle was a "happy drunk" or that he had a high tolerance for alcohol and appeared sober. Or that he never started a fight while drunk. Once more, however, the petitioner fails to provide any evidence to explain why trial counsel's failure to recall State witnesses was not strategic, instead relying on silence in the record. *Gentry*, 540 U.S. at 8.  On the present facts, the Mississippi Supreme Court could have reasonably presumed that trial counsel's failure to recall the State's witnesses was a strategic decision that the petitioner did not overcome, and, therefore, reasonably concluded that trial counsel's performance was not "deficient." The Court does not reach the prejudice prong. *Strickland*, 466 U.S. at 697.

For these reasons, the petitioner's *Strickland* trial claims fail.

### D.  Ineffective Assistance of Appellate Counsel

### i.  Law

Like above, a petitioner claiming ineffective assistance of appellate counsel must show (i) deficient performance and (ii) prejudice. *Smith*, 528 U.S. at 285. To prove deficient performance, the petitioner must show that appellate counsel "was objectively unreasonable . . . in failing to find

---

indirectly got Travis to concede that the group had a "few drinks" on the night in question. *See id.*, Ex. 4 (T. Brown T. 407:7–9).

arguable issues to appeal—that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them." *Id.* (citations omitted). To prove prejudice, the petitioner "must show a reasonable probability that, but for his [appellate] counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal." *Id.* (citations omitted). The deficient performance prong, however, does not need to be addressed first "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice[.]" *Id.* at 286 n.14.

### ii. Application

In the present case, the petitioner argues that appellate counsel, different from trial counsel, was constitutionally ineffective on two grounds. First, the petitioner argues that appellate counsel failed to raise his *Strickland* trial claim on direct appeal. Doc. [3], at 12–14. More specifically, the petitioner argues that appellate counsel should have argued that trial counsel was constitutionally ineffective for failing to re-urge the introduction of evidence showing Drystle's propensity for violence because such claim was unavailable via his PCR petition. *Id.*, at 13–14. Second, the petitioner argues that appellate counsel's failure to include the adverse Mississippi Court of Appeals decision on the issue of Drystle's BAC in Anderson's petition for writ of *certiorari* to the Mississippi Supreme Court constituted ineffective assistance of appellate counsel. *Id.*, at 12–14, 17.

Turning to the petitioner's first argument, the Mississippi Supreme Court retains discretion to hear ineffective assistance of counsel claims not raised on direct appeal. *See*, *e.g.*, *Goodin*, 856 So.2d at 279. *See also Faraga v. State*, 557 So.2d 771, 775 (Miss. 1990). The Mississippi Supreme Court evidently exercised that discretion with Anderson's PCR petition and addressed the merits of the underlying motion, unequivocally stating "Anderson's claims fail to meet the requisite prongs of deficient performance and prejudice provided in *Strickland v. Washington*, 466 U.S.

22

668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)." Doc. [8], Ex. C. Since the Mississippi Supreme Court decided the petitioner's *Strickland* claims on the merits, the Mississippi Supreme Court could have also reasonably concluded that there was no prejudice to the petitioner arising from appellate counsel's failure to raise those claims on direct appeal. *Smith*, 528 U.S. at 285 (citations omitted). The Court does not reach the deficiency prong of the analysis. *Smith*, 528 U.S. at 286 n.14.

Turning to Anderson's second argument, he argues that appellate counsel acted unreasonably by failing to further appeal the Mississippi Court of Appeals' ruling on Drystle's BAC in his petition for a writ of *certiorari* to the Mississippi Supreme Court. Doc. [3], at 17. The petitioner, however, has no right to counsel in a discretionary appeal, only a first appeal as of right. *See Ross v. Moffitt*, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974). An appeal to the Mississippi Supreme Court is, of course, discretionary in nature. *See* M.R.A.P. 17(h).[20] Therefore, the petitioner does not have a right to effective assistance of appellate counsel on appealing to the Mississippi Supreme Court. *See Wainwright v. Torna*, 455 U.S. 586, 586–87, 102 S.Ct. 1300, 71 L.Ed.2d 475 (1982). Since the petitioner's argument fails as a matter of law, the Mississippi Supreme Court could have reasonably concluded that the petitioner did not show prejudice arising from the omission. The Court does not reach the deficiency prong of the analysis. *Smith*, 528 U.S. at 286 n.14.

For these reasons, the petitioner's *Strickland* appellate claims fail.

### E.  State Evidentiary Issue

Finally, the petitioner argues that the state trial court's allegedly erroneous evidence decision, upheld by the Mississippi Court of Appeals, denied the petitioner a fundamentally fair trial for

---

[20] *See also Jones v. State*, 95 So.3d 641, 645 (Miss. 2012); *McCain v. State*, 81 So.3d 1055, 1059 n.5 (Miss. 2012).

several reasons.[21] Doc. [3], at 14–17.  First, the petitioner argues that the state trial court's ruling

that he could question witnesses about Drystle's alcohol consumption during the night in question

but not introduce Drystle's BAC was illogical and made "no sense." Doc. [3], at 14. The petitioner

continues that there is a "vast difference" between introducing Drystle's BAC, which was 0.193,

Doc. [1], Ex. C, and testimonial evidence about Drystle's alcohol consumption, Doc. [3], at 15. As

such, the jury only heard that Drystle had a couple of beers during the night in question and did

not consider that his autopsy BAC showed him to be "really, really drunk" that night. *Id.*, at 16–

17. For these reasons, the petitioner concludes, the state trial court placed "unconstitutional

constraints" on the petitioner's ability to present his case to the jury that rendered the trial

fundamentally unfair. *Id.*, at 17. *See also* Doc. [11], at 4–6.[22]

As noted above, the Mississippi Supreme Court denied the petitioner's Due Process claim on

grounds of "res judicata." Doc. [8], Ex. C. However, the petitioner's PCR petition did not raise the

*evidentiary* BAC claim brought on direct appeal. *Compare* Doc. [3], at 14–17 *with* Doc. [9], Ex.

8, at 14–15. To the contrary, in his PCR petition, Anderson alleged that he was denied due process

insofar as the state trial court barred entry of Drystle's BAC. It appears, then, that the Mississippi

Supreme Court did not address the petitioner's Due Process claim on the merits. For these reasons,

---

[21] In passing, the Court notes that the petitioner only cited Mississippi cases to support his due process argument in his Amended Petition. Doc. [3], at 14–17. *See also Newell v. State*, 49 So.3d 66 (Miss. 2010); *Edmonds v. State*, 955 So.2d 787, 798–99 (Miss. 2007); *Shaffer v. State*, 740 So.2d 273 (Miss. 1998).

[22] The petitioner cites Supreme Court cases in her reply.  Doc. [11], at 5–6. The petitioner cites *Holmes v. South Carolina*, 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006), *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), and *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L. Ed. 2d 297 (1973) in support of his argument that the state trial court violated his due process rights. Doc. [11], at 5–6. However, this line of cases, *Holmes, Crane,* and *Chambers,* dealt with the issue of whether state evidentiary *rules* prevented a defendant from a having "'meaningful opportunity to present a complete defense.'" *Holmes,* 547 U.S. at 321–25 (citations omitted) ("This case presents the question whether a criminal defendant's federal constitutional rights are violated by an evidence rule . . . ."); *Crane,* 476 U.S. at 295–302 (concluding that Kentucky evidentiary ruling, Ky. RCr 9.78, prohibiting introduction of evidence casting doubt on credibility of confession, was unconstitutional) *Chambers,* 410 U.S. at 295 ("In this case, petitioner's request to cross-examine McDonald was denied on the basis of a Mississippi common-law rule that a party may not impeach his own witness."). Since the petitioner is challenging the state trial court's evidentiary ruling *as applied*, not the evidentiary rule itself, these cases are inapplicable to the present petition. Doc. [11], at 5–6.

the petitioner's Due Process claim is reviewed without deference to the state court. *See*, *e.g.*, *Gonzales v. Thaler*, 643 F.3d 425, 429–30 (5th Cir. 2011).

"[A] trial that is unfair, whatever the cause of such unfairness, violates Fourteenth Amendment due process." *Fitzgerald v. Estelle*, 505 F.2d 1334, 1336 (5th Cir. 1975). "An unfair trial has been characterized as one that has been 'largely robbed of dignity due a rational process.'" *Menzies v. Procunier*, 743 F.2d 281, 286 (5th Cir. 1984) (quoting *Houston v. Estelle*, 569 F.2d 372, 383 (5th Cir. 1978)). "Whether a criminal defendant has received such a 'dignified' or 'fair' trial, as mandated by the [F]ourteenth [A]mendment, must be determined by examining the particular facts of each individual case." *Ibid.*

> Due process is implicated only for rulings "of such a magnitude" or "so egregious" that they "render the trial fundamentally unfair." It offers no authority to federal habeas courts to review the mine run of evidentiary rulings of state trial courts. Relief will be warranted only when the challenged evidence "played a crucial, critical, and highly significant role in the trial."
>
> The due process inquiry must consider the significance of the challenged evidence "in the context of the entire trial." [T]he Due Process Clause does not afford relief where the challenged evidence was not the principal focus at trial and the errors were not "'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" This is a high hurdle, even without AEDPA's added level of deference.
>
> [*Gonzales*, 643 F.3d at 430–431 (citations omitted).]

As such, "[a] federal habeas court may consider the propriety of state court evidentiary rulings only if there has been a constitutional infraction that renders the entire trial fundamentally unfair." *Rodriguez v. Quarterman*, 535 F. Supp. 2d 820, 844 (S.D. Tex. 2007), *aff'd*, 327 F. App'x 466 (5th Cir. 2009). In conducting this analysis, it is irrelevant whether the evidence was correctly admitted under state law. *Id.* (citing *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)). Rather, the sole inquiry is whether the ruling violated the U.S. Constitution. *Id.* (citing

*Estelle*, 502 U.S. at 112).[23] Where an evidentiary ruling is challenged on due process grounds, this standard applies to both erroneous exclusion and erroneous admission of evidence. *See Porretto v. Stalder*, 834 F.2d 461, 465 (5th Cir. 1987); *Skillern v. Estelle*, 720 F.2d 839, 852 (5th Cir. 1983).[24]

Here, the state trial court's exclusion of Drystle's autopsy BAC did not render the trial "fundamentally unfair" and, therefore, did not violate the petitioner's Due Process rights. *Gonzales*, 643 F.3d at 430–31. The Court begins with the intrinsic relevance of Drystle's BAC. First, and most importantly, no evidence was presented at trial to show that Drystle was violent when drunk. Additionally, the petitioner did not know Drystle before the events of April 10, 2009, only perceiving him to generally be "drunk." Doc. [9], Ex. 5 (M. Anderson T. 482:22–27). In fact, Anderson did not fear for his safety until he was, in his words, hit in the back of the head by Drystle. Doc. [9], Ex. 5 (M. Anderson T. 491:13–14, T. 506:17–21.) As such, while Drystle's BAC might have been somewhat relevant to establishing his impaired state of mind, nothing presented at trial established a connection between Drystle's BAC and the proposition that he was violent when drunk. These realities seriously reduce the inherent relevance of Drystle's BAC at the threshold.

Turning to the trial, the "heart of the case" was not whether Drystle started the fight. *Gonzales*, 643 F.3d at 431. Instead, the "heart of the case" was whether Anderson used *reasonable* force to protect himself. Doc. [9], Ex. 2 (T. 139:22–25); Ex. 5 (T. 558:20–559:11). For example, none of the State's witnesses testified to seeing the immediate impetus for the fight, *id.*, Ex. 4 (E. Coleman

---

[23] *See also Garza v. Thaler*, 909 F. Supp. 2d 578, 661–62 (W.D. Tex. 2012).

[24] *See also Brown v. Cain*, No. 6:11–CV–0736, 2012 WL 7989312, at *2–*3 (W.D. La. Apr. 17, 2012); *Flores v. Davis*, No. CV H–15–1208, 2016 WL 8223054 (S.D. Tex. Dec. 19, 2016), *report and recommendation adopted*, No. CV H–15–1208, 2017 WL 514246 (S.D. Tex. Feb. 7, 2017*); Kirkham v. Hood*, No. 2:12–CV–103–NBB–JMV, 2015 WL 1931300, at *8 (N.D. Miss. Apr. 28, 2015).

T. 322:23–323:6); (S. Johnson T. 16–19); (S. Coleman T. 373:2–11, 376:21–22); (T. Brown T. 408:23–28); (W. Sanders T. 423:24–424:3), though Sylvester contradicted Anderson about certain events prior to the altercation, *id.*, Ex. 4 (S. Coleman T. 354:22–355:2, 355:20–24, 356:19–357:7, 370:9–14, 370:3–371:2, 371:2–3, 372:14–23, 376:1–7). Instead, the State introduced damning testimony that Anderson stood over Drystle, wounded and lying on the ground, and shot him in the heart from close range. *Id.*, Ex. 4 (S. Johnson T. 326:17–28, 336:5–7, 337:11–19, 348:16–21). The State also introduced live testimony that Drystle was not armed with a gun on the night in question. *Id.*, Ex. 4 (E. Coleman T. 307:15–20); (T. Brown T. 416:26–27). This and related live testimony, not scientific evidence of Drystle's BAC that night, was critical to the jury's evaluation, *Reddix v. State*, 731 So.2d 591 (Miss. 1999); *Flowers v. State*, 473 So.2d 164 (Miss. 1985),[25] of whether the "danger to the defendant . . . [was] either actual, present and urgent, or [the] defendant . . . [had] reasonable grounds to apprehend design on the part of the victim to kill, or to do him some great bodily harm, and, in addition, there must [was] imminent danger of such design being accomplished[,]" *Anderson v. State*, 571 So.2d 961, 963 (Miss. 1990) (collecting cases). For these reasons, Drystle's BAC was plainly not a "crucial, critical, highly significant factor" in Anderson's trial. *Gonzales*, 643 F.3d at 430–31 (citations omitted).[26]

By extent, the apparent error also was not "'so pronounced and persistent that it permeate[d] the entire atmosphere of the trial.'" *Id.* (quoting *Gordon v. Johnson*, 189 F.3d 468, 1999 WL 548588, at *2 (5th Cir.1999) (unpublished)). Multiple witnesses testified that Sylvester fled the

---

[25] *See also* Miss. Prac. Model Jury Instr. Criminal § 2:13 (2d ed.).

[26] Even assuming *arguendo* that the determination of the aggressor was at the heart of this trial, *Menzies*, 743 F.2d at 286, Drystle's BAC was not central to consideration of whether he was the aggressor because (i) there was no link between Drystle's alcohol consumption and a propensity for violence; (ii) Anderson did not know who Drystle was; and (iii) Anderson was not afraid of Drystle upon observing him as "just a drunk with poor posture" in the Triple-A Store, only upon, in his words, being hit in the head. *Id.*, Ex. 5 (M. Anderson T. 482:22–27. 494:29–495:2). Altogether, whether Drystle was "really, really drunk," Doc. [3], at 16, was plainly not a "crucial, critical, highly significant factor" in making such a determination, *Gonzales*, 643 F.3d at 430–31 (citations omitted).

scene upon hearing the initial gunshots. Doc. [9], Ex. 4 (E. Coleman T. 302:6–21, 304:1–7); (S. Coleman T. 357:17–25, 359:2–3); (T. Brown T. 402:10–13); (W. Sanders T. 423:27–424:3). Multiple witnesses testified that the Buick also fled the scene to escape. *Id.*, Ex. 4 (S. Coleman T. 357:21–25). Multiple witnesses testified that they then saw Anderson standing over Drystle, wounded and lying on the ground, with a gun, and heard shots shortly thereafter. *Id.*, Ex. 3 (G. Ward T. 159:7–27), Ex. 4 (S. Johnson T. 335:17–22). Johnson testified to also seeing Anderson shoot Drystle in the chest from close range. *Id.*, Ex. 4 (S. Johnson T. 326:17–28, 336:5–7, 337:11–19, 348:16–21). This testimony was supported by the autopsy, which noted that a close-range gunshot wound to the chest pierced Drystle's heart and killed him. *Id.*, Ex. 5 (A. McMaster T. 460:7–18). Finally, two individuals with Drystle that night testified that he did not have a handgun with him. *Id.*, Ex. 4 (E. Coleman T. 307:15–20); (T. Brown T. 416:26–27). In light of these and other pieces of testimony, the mere failure to admit Drystle's BAC into evidence plainly was not "'so pronounced and persistent that it permeate[d] the entire atmosphere of the trial.'" *Gonzales*, 643 F.3d at 430–31 (quoting *Gordon*, 1999 WL 548588, at *2).

For these reasons, the exclusion of Drystle's BAC did not render the petitioner's trial fundamentally unfair.

## **RECOMMENDATION**

Based on the foregoing, the undersigned recommends that petitioner Michael T. Anderson's *habeas corpus* petition be dismissed with prejudice.

## **NOTICE OF RIGHT TO APPEAL/OBJECT**

Pursuant to 28 U.S.C. § 636(b)(1), any party who desires to object to this report must serve and file written objections within fourteen (14) days after being served with a copy unless the time period is modified by the District Court.  A party filing objections must specifically identify those

findings, conclusions and recommendations to which objections are being made; the District Court need not consider frivolous, conclusive or general objections. Such party shall file the objections with the Clerk of the Court and serve the objections on the District Judge and on all other parties. A party's failure to file such objections to the proposed findings, conclusions and recommendation contained in this report shall bar that party from a de novo determination by the District Court. Additionally, a party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in this report within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions that have been accepted by the district court and for which there is no written objection. *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1428–29 (5th Cir. 1996).

**SO ORDERED AND ADJUDGED**, this the 27th day of January 2021.

/s/ *Robert P. Myers, Jr.*
ROBERT P. MYERS, JR.
UNITED STATES MAGISTRATE JUDGE